# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

---

ROBERT GORDON,

          **Plaintiff,**

   v.

ERIC HOLDER, *et al*.,

          **Defendants.**

Civil Action No. 10-01092

Hon. Royce C. Lamberth

---

### MEMORANDUM OF LAW OF *AMICI CURIAE* NATIONAL ASSOCIATION OF CONVENIENCE STORES IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PERMANENT INJUNCTION AND DECLARATORY RELIEF

John O'Connor
Douglas S. Kantor
Steptoe & Johnson LLP
1330 Connecticut Avenue NW
Washington, D.C. 20036
Telephone: 202.429.3775
Facsimile: 202.429.3902

*Attorneys for Proposed Amicus Curiae*

## INTRODUCTION

Plaintiff Gordon complains that it would be a terrible burden for him to understand and comply with the tax laws of the state and local jurisdictions in which he sells. But his competitors — law abiding brick-and-mortar convenience and other cigarette stores — do exactly that every day. And brick-and-mortar stores that operate multi-state chains do so for each and every one of the jurisdictions in which they sell cigarettes.[1]

Mr. Gordon is not entitled to equitable relief. *First*, he cannot sustain a facial challenge. Under long-standing Supreme Court and D.C. Circuit precedent he would have to show that there is *no circumstance* in which the PACT Act is constitutional. Yet there are states and cities where Mr. Gordon once sold as many as fifty cartons of untaxed cigarettes *per day*. Because Mr. Gordon has minimum contacts with those states and cities under *any* standard, the Court must deny his "facial" due process challenge.

*Second*, unlike the state statute at issue in *Quill Corporation v. North Dakota ex rel. Heitkamp*, 504 U.S. 298 (1992), this suit involves *federal* enforcement of a *federal* statute. The proper due process test is, accordingly, whether Mr. Gordon has minimum contacts with the United States as a whole. Mr. Gordon does not — and could not — argue that he lacks such contacts.

*Third*, Mr. Gordon's due process challenge would be meritless even if the Court improperly applied the *Quill* state-by-state minimum contacts test. Mr. Gordon has made no effort to show that he lacks minimum contacts with the states into which he sold cigarettes and

---

[1] *Amicus curiae* National Association of Convenience Stores ("NACS") is a trade association whose general purpose is to promote and represent the interests of retail and supplier stores across the country, including convenience stores that sell cigarette products and pay all applicable taxes associated with those sales.

the record demonstrates that Mr. Gordon had tens of millions of dollars annual revenue selling untaxed cigarettes across the United States.

*Finally*, Mr. Gordon faces no risk of irreparable injury in the absence of a permanent injunction.  He has permanently exited the cigarette business, so he will be completely unaffected going forward by the PACT Act's tax provisions.  His concern about lawsuits based on past conduct is altogether speculative, and even if such suits do arise Mr. Gordon can assert his Due Process defenses then.  Mr. Gordon's speculative concerns about harm are far outweighed by the private and public harms Congress intended to address through the PACT Act's tax provisions:  unfair diversion of federal, state and local tax revenues, increased youth access to cigarettes at an unnaturally low price, and injury to law-abiding brick-and-mortar cigarette vendors who *do* routinely collect and pay state and local excise taxes.

## BACKGROUND

### A.    Internet Cigarette Sales

Cigarettes are highly taxed and regulated products.  Convenience stores in New York City charge over $11.00 for a single pack,[2] with more than *half* that amount attributable to state and local taxes.[3]   These taxes not only fund state and local services like trash collection and dispute resolution, they are also intended to serve public policies such as reducing cigarette use by increasing the overall cost of that product.[4]

---

[2]    Nicholas Confessore, *Cigarette Tax Increased to Keep State Running*, N.Y. Times, June 21, 2010, *available at* http://www.nytimes.com/2010/06/22/nyregion/22budget.html.

[3]    N.Y. Tax Law § 471(1) (excise tax is $4.35 per pack); N.Y.C. Admin. Code § 11-1302 (city excise tax is additional $1.50 per pack, for a total state and local excise tax of $5.85 per pack); *see also* New York Dep't of Taxation and Finance, *Cigarette and obacco products tax*, http://www.tax.ny.gov/bus/cig/cigidx.htm (last updated Jan. 29, 2014).

[4]    *See, e.g.*, New York Dep't of Health, *Tobacco Control Policies in NYS*, https://www.health.ny.gov/prevention/tobacco_control/current_policies.htm (last visited Sept. 10, 2014) (listed New York's "highest state cigarette tax in the United States" as one of the

Footnote continued on next page

Despite Mr. Gordon's complaints about complexity, the brick-and-mortar convenience stores with whom he competed routinely collect and pay those excise taxes, and comply with other relevant local tobacco regulations.[5] Those who operate chains of brick-and-mortar convenience stores located in multiple states (or nationwide) routinely determine and comply with the excise tax and other tobacco regulations of different states and localities in which they operate.[6]

High cigarette excise taxes encouraged the growth of a "black market" of Internet cigarette vendors who offer customers highly "discounted" cigarettes, with the discounts based

---

Footnote continued from previous page

State's "strong and effective tobacco control policies"); New York City Global Partners, *Best Practice: Tobacco Control Program*, http://www.nyc.gov/html/ia/gprb/downloads/pdf/NYC_Health_TobaccoControl.pdf (Feb. 3, 2014) (listing New York City's excise tax increases as part of its plan "to reduce smoking among youth and adults"); *see also* United States Dep't of Health & Human Svcs., *The Health Consequences of Smoking—50 Years of Progress: A Report of the Surgeon General*, at 12 (2014), *available at* http://www.surgeongeneral.gov/library/reports/50-years-of-progress/full-report.pdf("evidence is sufficient to conclude that increases in the price of tobacco products, including those resulting from excise tax increases, prevent initiation of tobacco use, promote cessation, and reduce the prevalence and intensity of tobacco use among youth and adults").

[5]   In addition to tax laws, there are a host of other laws that cigarette retailers must take care to follow. In New York, for example, these include laws requiring extensive licensing and registration requirements, which often include payment of fees to the State; the maintenance and filing of reports with the State; restrictions on where and how tobacco products can be displayed in a store; and, of course, laws that strictly require age verification of the purchaser to ensure that minors do not have access to tobacco products. *See, e.g.* N.Y. Tax Law § 470 (definition); N.Y. Tax Law § 471(1) (taxation and stamping); N.Y. Tax Law § 473 (stamping and reporting requirements); N.Y. Pub. Health Law § 1399-ll(1) (licensing and transporting); N.Y. Tax Law § 480(1) (licensing); N.Y. Tax Law § 480-a (registration); N.Y. Tax Law § 483 (minimum pricing); N.Y. Pub. Health Law § 1399-cc (age restrictions). New York also has reduced cigarette ignition propensity laws that require vendors to sell only cigarettes that will self-extinguish if not smoked within a specified time period. *See* N.Y. Exec. Law § 156-c.

[6]   Other businesses also manage to comply with the laws of the states and localities into which they make remote sales. Remote wine sellers, for example, have created Internet tools to identify the relevant laws for each jurisdiction. *See, e.g.*, Wine Institute, *State Shipping Laws for Wineries Portal*, http://www.wineinstitute.org/initiatives/stateshippinglaws (last visited Sept. 20, 2014).

entirely on the vendors ignoring state and local tax obligations and other cigarette laws.[7]

Consumers' ability to obtain untaxed black market cigarettes — at prices discounted by up to

half the cost of legitimate cigarettes — led to a rapid expansion in this Internet marketplace.  By

2005, there were at least 500 cigarette-selling websites.  15 U.S.C. § 375, Note.[8]

      One study estimated that losses in state tax revenue as a result of cigarette tax evasion

(including Internet sales) increased from less than $170 million in 1990 to more than $550

million by 2000.[9]   Because states and localities intended high state and local excise taxes to

reduce overall cigarette use, the Internet black market for untaxed cigarettes served as a

significant obstacle to that goal.

     **B.**    **The PACT Act**

      Congress responded to this Internet black market in untaxed cigarettes by enacting the

Prevent All Cigarette Trafficking ("PACT") Act, P.L. 111-154, 124 Stat. 1087 (2010).  The

legislation was approved by a unanimous Senate and by an overwhelming majority in the House

of Representatives (387 to 25).  It became effective on June 29, 2010.  The PACT Act addressed

the untaxed Internet sales in four basic ways:

---

[7]    "The incentive to profit by evading payment of taxes rises with each tax rate hike imposed by federal, state and local governments."  U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Division, *The Bureau of Alcohol, Tobacco, Firearms and Explosives' Efforts to Prevent the Diversion of Tobacco*, at ii (Sept. 2009), www.justice.gov/oig/reports/ATF/e0905.pdf.

[8]    *See also* Campaign for Tobacco Free Kids, *Internet Sales of Tobacco Products – Reaching Kids & Evading Taxes* (Apr. 28, 2008), http://www.tobaccofreekids.org/research/factsheets/pdf/0213.pdf (estimating that by 2006 there were more than 700 Internet websites selling cigarettes to United States consumers) .

[9]    *See, e.g.* K. Davis, M. Farrelly, Q. Li, and A. Hyland, *Cigarette Purchasing Patterns Among New York Smokers: Implications for Health, Price, and Revenue*, at 3 (Mar. 2006) (prepared for the New York Department of Health), http://www.health.state.ny.us/prevention/tobacco_control/docs/cigarette_purchasing_patterns.pdf , at 3.

- *Jenkins Act.*  The PACT Act strengthened sellers' existing Jenkins Act obligations to provide information about their delivery sales to the Attorney General and to the States into which they sell cigarette and smokeless products.  *See* 15 U.S.C. § 376(a).

- *Youth Access*.  The Act also provides important rules governing delivery shipments to prevent youth access to cigarette and smokeless products.  These include labeling their shipment packages to identify them as cigarette/smokeless tobacco products, restricting the weight of shipment packages, and requiring age verification at the time of the order and at delivery.  *See* 15 U.S.C. §§ 376a(b)(1)-(b)(4).

- *Tax Fairness.*  The PACT Act requires delivery sellers to comply with the local tax and other tobacco-related laws of the jurisdictions into which they sell products.  This includes ensuring that all excise taxes are paid prior to delivering the product.  *See* 15 U.S.C. §§ 376a(a), 376(a)(d).

- *No USPS Shipments*  Finally, the PACT Act provides that the United States Post Office shall not deliver cigarettes or smokeless tobacco products (with very limited exceptions).  *See* 18 U.S.C. § 1716E.

Congress made clear that it intended the PACT Act to address numerous public harms caused by Internet sales of untaxed cigarettes, including billions of dollars of lost federal, state and local tax dollars,[10] the lack of safeguards to prevent such sales from reaching children,[11] and the unfair competition untaxed Internet sales posed to tax-paying brick-and-mortar cigarette vendors.[12]

## C.    Mr. Gordon's Business

For many years, Mr. Gordon sold cigarettes from the Seneca Nation of Indians' Allegany Reservation in New York State,[13] a reservation that had 8,000 tribal members as of 2011

---

[10]    *See* 15 U.S.C. § 375 Note, finding that "the sale of illegal cigarettes . . . significantly reduces Federal, State, and local government revenues, with Internet sales alone accounting for billions of dollars of lost Federal, State, and local tobacco tax revenue each year."

[11]    *See id.*, finding that "the sale of illegal cigarettes . . . over the Internet, and through mail, fax, or phone orders, makes it cheaper and easier for children to obtain tobacco products."

[12]    *See id.*, finding that "unfair competition from illegal sales of cigarettes . . . is taking billions of dollars of sales away from law-abiding retailers throughout the United States."

[13]    Affidavit of Marcia Gordon ¶¶ 2-3 (Aug. 20, 2010) ("First Gordon Aff.").

supported no less than 140 tobacco-related businesses.[14]  In 2009, Mr. Gordon's tobacco

business had revenues of some $24 million dollars and profits between $1.2 million and $2.4

million.[15]  In May 2012, Mr. Gordon sold fifty cartons of untaxed cigarettes *per day* to customers

in New York City.[16]  Ninety-five percent of Gordon's revenues were from cigarette sales "to

non-Indians who do not live on the Allegany [Seneca] territory."[17]

    Mr. Gordon achieved these sales through a website, www.allofourbutts.com (First

Gordon Aff. ¶ 6), that offered to share Seneca tribal members' right to buy tax-free cigarettes

with non-Indians across the country:

> As a Sovereign Nation, we do not pay state taxes on cigarettes and tobacco
> products, we then pass this savings on to all of our customers nationwide by
> offering discount cigarettes . . . online.[18]

Mr. Gordon's business was thus fundamentally based on exactly what the Supreme Court has

ruled tribal vendors may not do:  "market[ing] an exemption from state taxation" to non-tribal

members.  *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134,

155 (1980).[19]  The rationale for allowing tax-free sales to tribal members for personal

consumption simply "does not apply to taxation of [non-tribal] members."  *Duro v. Reina,* 495

U.S. 676, 686-87 (1990).

---

[14]    Pl. Robert Gordon's Renewed Application for a Prelim. Inj., (Apr. 20, 2011) ("Renewed Application"), at 3.

[15]    *See* First Gordon Aff. ¶ 13.

[16]    *See* Gordon Defs.' Am. Resp. to Pl.'s First Set of Requests for Admission, at 4-5, *City of New York v. Gordon*, Civil No. 12cv4838 (S.D.N.Y. served Nov. 29, 2012).

[17]    Pl. Robert Gordon's Application for a TRO and Prelim. Inj., (June 28, 2010), at 6 (citing First Gordon Aff.¶ 5).

[18]    *See* Exhibit A to this *Amicus* Brief, at 2.

[19]    *See also Colville*, 447 U.S.at 158-59; *Cal. State Bd. of Equalization v. Chemeheuvi Indian Tribe*, 474 U.S. 9, 11-12 (1985) *(per curiam)*; *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 512 (1991); *Dep't of Tax. & Fin. v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 73-75 (1994).

Mr. Gordon's disregard of the law went well beyond taxes.  For over forty years, the Jenkins Act has required vendors selling cigarettes into another state to report to the destination state's tax administrators the names and addresses of their customers and the quantity of cigarettes they purchased.  *See* 15 U.S.C. §§ 375-378.  This information assists state efforts to collect cigarette taxes directly from the purchasing customers.  *See Hemi Group, LLC v. City of New York,* 559 U.S. 1, 6 (2010).  But Mr. Gordon's website for years assured customers that it would never "report tax or customer information to any government agency or other entity."[20] The Rule 30(b)(6) corporate designee for allofourbutts.com confirmed that the company simply ignored the Jenkins Act.[21]  The company had received numerous cease-and-desist letters from state revenue and law enforcement officials, but "file[d them] under G for garbage."[22]

Mr. Gordon has now exited the tobacco business and will not re-enter it.  He stipulated in this case that he had permanently exited that business because of "health problems and his deteriorating financial situation."[23]  In addition, Mr. Gordon agreed to have no involvement in any future cigarette sales as a condition of settling a lawsuit by the City of New York alleging violations of the PACT Act, 15 U.S.C. § 375, *et seq.,* the Contraband Cigarette Trafficking Act, 18 U.S.C. § 2341, *et seq.*, the Cigarette Marketing Standards Act, N.Y. Tax Law § 483, *et seq.* and RICO, 18 U.S.C. § 1961, *et. seq.*[24]

---

[20]   *See* Exhibit A, at  7.

[21]   Rule 30(b)(6) Deposition of Marcia Gordon,  *Philip Morris USA v. Veles*, Case No. 06-CV-2988, at 181-85, 373 (S.D.N.Y. Apr. 15 ,2008) ("All of Our Butts 30(b)(6) Dep.").

[22]   *Id.* at 181-83, 231-38.

[23]   Joint Stipulations ¶ 11 (May 29, 2014) , ECF No. 47.

[24]   *See City of New York v. Gordon*, --- F. Supp. 2d ----, 2013 WL 2190060 (S.D.N.Y. 2013), Order on Consent, *City of New York v. Gordon*, No. 12 Civ. 4838 (S.D.N.Y. June 10, 2014), ECF No. 127.

## ARGUMENT

A permanent injunction is an "extraordinary remedy,'" *Baumann v. District of Columbia*, 744 F. Supp. 2d 216, 227 (D.D.C. 2010).  A plaintiff seeking that relief "must demonstrate that (1) it will suffer an irreparable injury in the absence of an injunction; (2) legal remedies are insufficient to compensate for that injury; (3) considering the balance of hardships between the parties, an equitable remedy is warranted; and (4) the injunction is in the public interest." *Beck v. Test Masters Educ. Servs. Inc.*, 994 F. Supp. 2d 98, 101 (D.D.C. 2014).  Mr. Gordon neither satisfies these standards nor demonstrates his entitlement to extraordinary relief.

## I.   PLAINTIFF CANNOT SATISFY ANY OF THE PERMANENT INJUNCTION FACTORS

### A.   Mr. Gordon Has No Likelihood of Success on the Merits

#### 1.   Plaintiff's "Facial" Challenge Fails Because He Undisputedly Had Massive "Contacts" With Many States

A "facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstance exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Cellco P'ship v. FCC*, 700 F.3d 534, 549 (D.C. Cir. 2012) (same); *Clayton v. District of Columbia*, 931 F. Supp. 2d 192, 207 (D.D.C. 2013) (same); *Heller v. District of Columbia*, --- F. Supp. 2d ----, 2014 WL 1978073 (D.D.C. 2014) (same).[25]  In *Nebraska v. EPA*, 331 F.3d 995, 998 (D.C. Cir. 2003), for example, plaintiffs presented a facial Commerce Clause/Tenth Amendment challenge

---

[25]   *See also, e.g.*, *Arizona v. United States*, 132 S. Ct. 2492, 2515 (2012) (Scalia, J., concurring in part and dissenting in part) ("[t]he fact that [a law] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an overbreadth doctrine outside the limited context of the First Amendment" (internal citations and quotation marks omitted)); *DynaLantic Corp. v. U. S. Dep't of Defense*, 885 F. Supp. 2d 237, 271 (D.D.C. 2012) (facial challenge must show that law has no valid application); *Daskalea v. Wash. Humane Soc.*, 577 F. Supp. 2d 82, 88 (D.D.C. 2008) (same); *Lightfoot v. District of Columbia*, Civil Action No. 01-1484, 2007 WL 1087474, at *4 (D.D.C. Apr. 10, 2007) (same).

to EPA rules, arguing that they regulated entirely intrastate sale and distribution of drinking

water.  The D.C. Circuit rejected the challenge, noting that

> According to data EPA collected, a number of water utilities sell substantial
> volumes of drinking water across state lines. . . . Each of these interstate sales
> presents a set of circumstances under which the Act is a valid exercise of power
> under the Commerce Clause.  We therefore reject petitioners' facial attack on this
> ground, and do not address whether the intrastate sale of drinking water has a
> sufficiently substantial impact on interstate commerce to justify federal
> regulation.

*Id.* at 998.  So long as EPA's regulation of the interstate sales were constitutional, the D.C.

Circuit held, plaintiffs' facial challenge was meritless even though there might be many other

applications (intrastate sales) where the constitutional challenge was valid.  *Id.*

The *Salerno* doctrine is fatal to this facial challenge.  Mr. Gordon sold *massive* volumes

of untaxed cigarettes to customers across the country.  He sold fifty cartons of cigarettes *per day*

to New York City customers in May 2012.[26]  In 2009, he sold $24 million worth of untaxed

cigarettes, virtually all of which were out-of-state delivery sales.[27]  The Rule 30(b)(6) corporate

designee for his business allofourbutts.com gave extensive testimony describing out-of-state

advertising efforts of Mr. Gordon's company in distant states such as California, Wisconsin, and

Massachusetts.  These advertising efforts included both print-advertisements and direct mail

campaigns.[28]  These facts leave no doubt that Mr. Gordon had "minimum contacts" with New

York state and many other jurisdictions.  There *are*, accordingly, circumstances "under which the

Act [is] valid" and the Court should deny Mr. Gordon's facial challenge.  *Salerno*, 481 U.S. at

745.

---

[26]   *See supra* note 16 and accompanying text.

[27]   *See supra* notes 16-17 and accompanying text.

[28]   All of Our Butts 30(b)(6) Dep. At 157-159; 164-169; *see also* Deposition of Robert
Gordon, *Philip Morris USA v. Veles*, Case No. 06- CV-2988, at 16-23 (S.D.N.Y. May 18, 2009).

Mr. Gordon is wrong that the "D.C. Circuit accepted that Mr. Gordon could bring a facial challenge to the PACT Act . . .." Mem. at 12. To the contrary, the Court found only that it was "not willing to hold — *at the preliminary injunction stage* — that Gordon is unable to maintain a facial challenge." Gordon v. Holder, 721 F.3d 638, 654 (D.C. Cir. 2013) (emphasis added). The D.C. Circuit certainly did not purport to overrule *Salerno*, or the dozens of other decisions in this Circuit that routinely apply the *Salerno* rule that facial challenges fail unless there is "no set of circumstances" in which the "Act would be valid." 481 U.S. at 745.

The two cases the D.C. Circuit cited did not even address directly the proper standard for ruling on facial constitutional challenges to statutes. Both *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), involved Tenth Amendment challenges to statutes that purported to criminalize seemingly local activity (firearm possession in *Lopez* and gender-motivated violence in *Morrison*). In both cases, the Court observed that Congress could properly invoke Commerce Clause authority to justify the federal statutes in three separate ways.

The first two, regulating the channels of interstate commerce and protecting the instrumentalities of interstate commerce, were not at issue in either case. *See Lopez*, 514 U.S. at 558; *Morrison*, 529 U.S. at 609. *Lopez* and *Morrison* discussed the need for a "jurisdictional element which would ensure, through case-by-case inquiry, that the [activity regulated] affects interstate commerce" *only* as one of several factors relevant to the third possible basis for Commerce Clause-based jurisdiction, *i.e.*, whether the statute regulates an "activity that substantially affects interstate commerce." *Lopez*, 514 U.S. at 559, 561; *see also Morrison*, 529 U.S. at 611.

There is no credible argument that *Lopez* and *Morrison* overrule the long-standing *Salerno* rule that facial challenges to federal legislation must demonstrate that there is "no set of circumstances . . . under which the Act would be valid." 481 U.S. at 745. They do not purport to overrule *Salerno*, and *Morrison* stressed that that the "noneconomic, criminal nature of the conduct at issue" was "central" to the *Lopez* and *Morrison* decisions. *See* 529 U.S. at 610. Moreover, this Court has continued to apply the *Salerno* rule after the decisions in *Lopez*, *Morrison* and, for that matter, the Circuit decision in *Gordon*, without making *any* inquiry into whether the statute at issue has a limiting jurisdictional element. *See, e.g.*, *Heller*, 2014 WL 1978073, at *5.

Given the concededly enormous volume of untaxed cigarette sales Mr. Gordon made to jurisdictions like New York City (50 cartons *per day*), he has not — and cannot — show that there is "no set of circumstances" in which the PACT Act satisfies any Due Process minimum contacts test the Court might adopt. Accordingly, the Court must deny Mr. Gordon's facial challenge to the tax fairness provisions of the PACT Act.

**2.      The "Quill" Standard Has No Application to Federal Legislation, Which Satisfies Due Process So Long as Plaintiff Has Minimum Contacts With the United States As a Whole.**

Relying almost exclusively on *Quill*, 504 U.S. 298, Mr. Gordon argues that the PACT Act violates due process by requiring him to comply with the excise tax and other laws of the states and localities into which he sells cigarettes. *See Renewed Application*, at 22-27. But *Quill* involved a challenge to *state* legislation seeking to impose taxes on out-of-state sellers.

The due process standard articulated in *Quill* — minimum contacts with the taxing state — does not apply to the situation at issue here: *federal* efforts to enforce *federal* legislation. The courts have repeatedly upheld federal laws, like the PACT Act, that require companies dealing in interstate commerce to respect the laws of the states and jurisdictions in which they

sell their goods.  *See e.g., James Clark Distilling Co. v. W. Md. Ry. Co.*, 242 U.S. 311, 324 (1917) (upholding federal law requiring those shipping liquor in interstate commerce to comply with the laws of the States into which they ship); *Ky. Whip & Collar Co. v. Ill. Cent. R.R. Co.*, 299 U.S. 334, 348-49 (1937) (upholding federal statute making it illegal to transport in interstate commerce goods made by convict labor if the sale or use of those goods would violate the law of the destination state); *Griswold v. President of the United States*, 82 F.2d 922, 925-26 (5th Cir. 1936) (upholding federal statute prohibiting interstate shipment of oil that was produced in violation of state law); *Interactive Media Entm't & Gaming Ass'n v. Att'y Gen.*, 580 F.3d 113, 114 (3d Cir. 2009) (upholding federal statute outlawing Internet gambling where "'such bet or wager is unlawful under any applicable . . . State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made'" (citation omitted)).

Mr. Gordon is incorrect in arguing that Congress may enact such legislation only if the interstate sellers have "minimum contacts" with each of the 50 states.  Where a *federal* statute is challenged on due process grounds (unlike the *state* statute at issue in *Quill*) the proper question is whether the defendant has minimum contacts with the United States as a whole.  *See, e.g. Wiwa v. Shell Petroleum Dev. Co. of Nigeria, Ltd.*, 335 F. App'x 81, 83 (2d Cir. 2009) (in suit under the federal Alien Tort Claims Act the question was whether the case was properly dismissed for "failure to allege the requisite minimum contacts with the United States"); *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008) (in suit under federal maritime statutes, question was whether defendant had sufficient "contacts with the United States"); *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207-08 (2d Cir. 2003) (in suit under federal antitrust laws, question was whether defendant "ha[d] sufficient minimum contacts with the

United States to satisfy due process" (emphasis deleted)).[29]  It is undisputed that Mr. Gordon has minimum contacts with the United States as a whole.

  **3.**  **The PACT Act Imposes No Obligation on a Cigarette Vendor Unless It Deliberately Sells Cigarettes Into a State or Locality, and That Deliberate Sale Is Itself Sufficient to Create Minimum Contacts Even Under the *Quill* Standard**

  The PACT Act only requires Mr. Gordon to comply with the excise tax and other laws of a state or locality "[w]ith respect to [his] delivery sales into [that] specific State and place . . . ." 15 U.S.C. § 376a(a).  So Mr. Gordon is only required to comply with a particular jurisdiction's tax and other laws if he deliberately accepts an order for cigarettes from a resident of that jurisdiction, accepts payment, and then ships the cigarettes to an address in the jurisdiction.

  Even if the Court were to assume that due process required minimum contacts on a jurisdiction-by-jurisdiction basis, (and as explained in preceding section, it does not), the PACT Act plainly satisfies that test.  *By definition*, it only requires a cigarette seller to comply with an out-of-state jurisdiction's laws if the seller has chosen to establish minimum contacts by deliberately selling into that jurisdiction.

  A vendor has minimum contacts with a State if it "'purposefully direct[s]'" its activities into the State by delivering "'its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State . . . .'"  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985) (citations omitted); *see also Zippo Mfg. Co. v. Zippo Dot Com, Inc.*,

---

[29] *See also SEC v. Bilzerian*, 378 F.3d 1100, 1106 n.8 (D.C. Cir. 2004) ("the requirement of 'minimum contacts' with a forum state is inapplicable where the court exercises personal jurisdiction by virtue of a federal statute authorizing nationwide service of process. . . . In such circumstances, minimum contacts with the United States suffice"); *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368-69 (3d Cir. 2002) (same); *SEC v. Carillo*, 115 F.3d 1540, 1543 (11th Cir. 1997) (same).  Although these cases address the specific instance of statutes authorizing nationwide service of process, they also demonstrate the general principle that Congress has authority, consistent with the due process clause, to extend its jurisdiction over any entity that has minimum contacts with the United States.  In the PACT Act, Congress plainly sought to assert that broad jurisdiction over those selling cigarettes in interstate commerce.

952 F. Supp. 1119, 1124 (W.D. Pa. 1997) ("Traditionally, when an entity intentionally reaches

beyond its boundaries to conduct business with foreign residents, the exercise of specific

jurisdiction is proper. . . . Different results should not be reached simply because business is

conducted over the Internet.") (citations omitted).

Many courts have found minimum contacts based on minimal or isolated sales into the

state. *See, e.g.*, *Illinois v. Hemi Group LLC*, 622 F.3d 754, 758 (7th Cir. 2010), finding personal

jurisdiction over an Internet cigarette vendor because:

> Hemi created several commercial, interactive websites through which customers
> could purchase cigarettes from Hemi.  Hemi held itself out as open to do business
> with every state (including Illinois) except New York.  After the customers made
> their purchases online, Hemi shipped the cigarettes to their various destinations.
> It is Hemi reaching out to residents of Illinois, and not the residents reaching
> back, that creates the sufficient minimum contacts with Illinois that justify
> exercising personal jurisdiction over Hemi in Illinois.

*Id.*; *IP Innovation, LLC v. RealNetworks, Inc.*, 310 F. Supp. 2d 1209, 1213 (W.D. Wash. 2004)

("This single sale is sufficient to establish the minimum contacts that permit an exercise of

specific jurisdiction in a case arising out of that sale"); *see also Dental Arts Lab., Inc. v. Studio

360 The Dental Lab, LLC*, No. 10-CV-4535, 2010 WL 4877708, at *6 (N.D. Ill. Nov. 23, 2010)

(upholding personal jurisdiction because the defendant "made its products available to Illinois

consumers and did in fact sell to Illinois consumers"); *More Cupcakes, LLC v. Lovemore LLC*,

No. 09 C 3555, 2009 WL 3152458, at *4 (N.D. Ill. Sept. 24, 2009) ("Defendants in this case

have used their website to conduct business with Illinois customers on two occasions.

Defendants thus purposefully availed themselves of doing business in Illinois by selling their t-

shirts with the alleged infringing marks to Illinois consumers"); *Pope v. Elabo GmbH*, 588 F.

Supp. 2d 1008, 1020 (D. Minn. 2008) ("This Court finds . . . that a single direct sale . . . *can* be a

sufficient contact to support personal jurisdiction"); *Energy Brands Inc. v. Spiritual Brands, Inc.*,

571 F. Supp. 2d 458, 471-72 (S.D.N.Y. 2008) (finding personal jurisdiction based on sales of $160 in merchandise into New York).

Mr. Gordon is incorrect that finding minimum contacts based on a single deliberate sale provides "no assurance whatsoever that the tax burden will be rationally related to the benefits provided by the taxing state." Mem. at 27. *First*, the tax burden associated with a single sale is less than ten dollars even in New York City, the jurisdiction with the highest excise taxes. *See supra* note 3 and accompanying text. *Second*, states and localities adopt excise taxes for important policy reasons, such as trying to reduce overall cigarette use by making cigarettes expensive. *See supra* note 4 and accompanying text. These policies are potentially undermined by *any* sale of untaxed — and therefore unduly inexpensive – cigarettes. *Third*, Mr. Gordon's extensive complaints about the difficulty of figuring out the tax laws of the states into which he sells, *see* Mem. at 27, is contradicted by the fact that NACs' brick-and-mortar convenience stores are required to understand and comply with state and local tax laws as a matter course. The same is true for numerous supermarkets, pharmacies, restaurants, bars and other establishments with multiple physical locations. Mr. Gordon's insistence that he be free of that burden is just another effort to obtain an unfair competitive advantage over his brick-and-mortar competitors.

By definition, the PACT Act only requires compliance with the laws of jurisdictions with which the seller itself *has* created minimum contacts based on deliberate sales. On this basis alone, the PACT Act complies fully with due process.

### B. Mr. Gordon Faces No Risk of Irreparable Injury

Nor can Mr. Gordon show that he will "suffer an irreparable injury in the absence of an injunction" that "legal remedies are insufficient to compensate." *Beck*, 2014 WL 2803445, at *1; *see Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 142 (2010) (permanent injunctive relief unnecessary unless plaintiff can show "that they will suffer irreparable injury").

Mr. Gordon has quit the cigarette sales business, and has no intention of returning to it. Indeed, he is subject to a Consent Order issued by the Southern District of New York prohibiting him from re-entering that business.  *See supra* note 24 and accompanying text.  Accordingly, there is absolutely no risk that he will be injured in any way by enforcement of the tax provisions of the PACT Act.

Mr. Gordon is wrong that he can satisfy the crucial irreparable injury element simply by complaining that the PACT Act is unconstitutional.  *See* Mem. at 29-30.  "Suitors may not resort to a court of equity to restrain a threatened act merely because it . . . transcends constitutional powers.  They must show that the act complained of will inflict upon them some irreparable injury."  *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297 (D.D.C. 1976)(quoting *United Fuel Gas Co. v. R.R. Comm'n*, 278 U.S. 300, 310 (1928)).

Nor can Mr. Gordon show irreparable injury based on concerns that "[he] may owe back taxes and be the subject of enforcement actions based on his past transactions."  Mem. at 30.  To begin with, the danger of back tax claims or enforcement actions is entirely speculative.  *See Ashland*, 409 F. Supp. at 307 (injunctive relief "will not be granted against something merely feared as liable to occur at some indefinite time in the future" (citation omitted)).  Moreover, Mr. Gordon has not shown that he lacks a legal remedy to address this danger:  there is no reason he would not be able to assert his Due Process claims as a defense against any future back tax or enforcement action.

### C.    The Balance of Hardships and the Public Interest Weigh Strongly Against Injunctive Relief

Entry of a permanent injunction will, moreover, harm other parties and the public interest.  Congress deemed the PACT Act necessary to prevent the loss of billions of dollars of federal and state tax revenues, to discourage youth smoking, and to prevent tax-paying retailers

like *Amici* from losing hundreds of millions of dollars in revenues as a result of unfair

competition to vendors like Mr. Gordon who offer huge discounts on cigarettes because they do

not pay the applicable taxes.[30]  The National Association of Attorney Generals praised the PACT

Act immediately upon its passage, noting that would "enhance and improve both state and

federal budgets and protect[] the health of our nation's children."[31]

## II.    BECAUSE MR. GORDON'S CASE IS MOOT, THE COURT SHOULD VACATE THE DECISION AND INJUNCTION AND DISMISS

Article III restricts federal courts to deciding "actual, ongoing controversies."  *Nat'l*

*Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997)(quoting *Honig v.*

*Doe*, 484 U.S. 305, 317 (1988)).  Accordingly, "[e]ven where litigation poses a live controversy

when filed, . . . [this] court [must] refrain from deciding it if events have so transpired that the

decision will neither presently affect the parties' rights nor have a more-than-speculative chance

of affecting them in the future." *Nat'l Black Police Ass'n*, 108 F.3d at 349 (internal quotation

marks and citations omitted).  The Court should also, following standard practice, vacate the

preliminary injunction previously issued in the case.  *See Nat'l Kidney Patients Ass'n v. Sullivan*,

902 F.2d 51, 52 (D.C. Cir. 1990) (vacating preliminary injunction because case became moot).

Here, Mr. Gordon has exited the cigarette sales business permanently.  He has stipulated

that he has no intention of returning to that business, and indeed is subject to a Consent Order

---

[30]    *See* 15 U.S.C. § 375, Note (reciting Congressional findings of need for the PACT Act).
Mayor Bloomberg confirmed that out-of-state cigarette sellers "who evade taxes hurt our law-
abiding small businesses . . ."  Press Release, Office of the Mayor, Mayor Bloomberg Announces
Suit Against Out-of-State Cigarette Manufacturers for Illegal Sales (Dec. 14, 2010), *available at*
http://www.nyc.gov/portal/site/nycgov/menuitem.c0935b9a57bb4ef3daf2f1c701c789a0/index.js
p?pageID=mayor_press_release&catID=1194&doc_name=http%3A%2F%2Fwww.nyc.gov%2F
html%2Fom%2Fhtml%2F2010b%2Fpr508-10.html&cc=unused1978&rc=1194&ndi=1.

[31]    Blair Tinkle, *Attorneys General Praise PACT Act Being Signed Into Law*, from
NAAGazette, *available at* http://www.naag.org/attorneys-general-praise-pact-act-being-signed-
into-law.php (last visited Sept. 10, 2014).

issued by the Southern District of New York that prohibits him from future cigarette sales activities.  *See supra* notes 23-24 and accompanying text.  This litigation will thus has no potential impact on his future activities.

Mr. Gordon's sole argument against mootness is that he *might* face future suits for civil or criminal liability based on his past cigarette sales.  Mem. at 14-17.  But "to save a case from mootness the ongoing injury must be more than a 'remote possibility,' not 'conjectural,' more than 'speculative.'"  *Am. Family Life Ins. Co. v. FCC*, 129 F.3d 625, 628 (D.C. Cir. 1997)(quoting *Warth v. Seldin*, 422 U.S. 490, 507 (1975)).  Mr. Gordon relies on *Edgar v. MITE Corp.*, 457 U.S. 624 (1982) (*see* Mem. at 17), but in that case, the Court rejected mootness because state officials had affirmatively stated that they would bring an enforcement action based on the challenged statute.  *See* 457 U.S. at 630.  Here, there is "no litigation on the horizon, no complaints . . . on the verge of filing, no simmering disputes about to erupt into a lawsuit . . ."  *Am. Family Life Ins. Co.*, 129 F.3d at 628.  Mr. Gordon's concerns about *possible* future lawsuits are too remote to save the case from mootness.

The Court should, therefore, follow the normal procedure of vacating the preliminary injunction and dismissing the suit as moot.  *See*, *e.g.*, *Ashkenazi v. Att'y Gen.*, 346 F.3d 191, 192 (D.C. Cir. 2003) (because case became moot, the "district court's order granting the preliminary injunction is . . . vacated and the case is remanded with instructions to dismiss"); *Spirit of Sage Council v. Norton*, 411 F.3d 225, 230 (D.C. Cir. 2005) (because case became moot, court dismissed them as moot and vacated order under review").

## CONCLUSION

For all the reasons stated above, the Court should vacate the preliminary injunction and deny Mr. Gordon's request for permanent injunctive and declaratory relief.  The Court should

deny Mr. Gordon's claim for declaratory relief because, as explained above, it is meritless and moot.

Dated:  October 7, 2014                                  Respectfully submitted,


                                                         /s/ John O'Connor
                                                         John O'Connor
                                                         Douglas S. Kantor
                                                         Steptoe & Johnson LLP
                                                         1330 Connecticut Avenue NW
                                                         Washington, D.C. 20036
                                                         Telephone: 202.429.3775
                                                         Facsimile: 202.429.3902
                                                         joconnor@steptoe.com

                                                         *Attorneys for Amicus Curiae*